UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

IN RE:
ARTHUR F. TURNER AND                           Chapter 13
STEPHANIE A. TURNER,                           Case No. 09-18816-WCH
                    DEBTORS

**MEMORANDUM OF DECISION**

**I. INTRODUCTION**

The matter before the Court is the Trustee's Objection to Confirmation of Debtors' Amended Chapter 13 Plan (the "Objection") filed by the Chapter 13 trustee (the "Trustee") and the Response to Trustee's Objection to Confirmation of Debtors' Amended Plan (the "Response") filed by Arthur F. Turner and Stephanie A. Turner (collectively, the "Debtors"). Through the Objection, the Trustee asserts that the Debtors' proposed Chapter 13 plan (the "Second Amended Plan") does not meet the best efforts test of 11 U.S.C. § 1325(b)(1)(B) because a portion of the Debtors' monthly income is devoted to the maintenance of a vacation property. For the reasons set forth below, I will enter an order sustaining the Objection.

**II. BACKGROUND**

The Debtors filed their Chapter 13 petition on September 16, 2009. On October 13, 2009, the Debtors filed their schedules as well as the Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income ("Form 22C"). On line 20 of Form 22C, the Debtors indicated current monthly income of $8,061.50, which annualized on line 21 equals

1

$96,738. Because this amount is less than the applicable median family income for a family of four in this state, namely, $100,280, the Debtors are below median income debtors with an applicable commitment period of three years pursuant to 11 U.S.C. § 1325(b)(4). As below median income debtors, the Debtors were not required to determine their monthly disposable income under 11 U.S.C. § 1325(b)(2) on Form 22C.

On Schedule A - Real Property ("Schedule A"), the Debtors disclosed an ownership interest in their principal residence located in Attleboro, Massachusetts and a sixteen-by-twenty foot hunting cabin with a half bath located in Wellington, Maine (the "Vacation Property") worth $48,000. According to Schedule A and Schedule D - Creditors Holding Secured Claims ("Schedule D"), the Vacation Property is subject to first and second mortgages in favor of Camden National Bank with the remaining balances on the notes totaling $31,800. On Schedule C - Property Claimed as Exempt ("Schedule C"), the Debtors claimed an exemption in the Vacation Property in the amount of $16,200 pursuant to 11 U.S.C. § 522(d)(5).

On March 5, 2010, the Debtors filed an Amended Schedule I - Current Income of Individual Debtor(s) ("Amended Schedule I"), Amended Schedule J - Current Expenditures of Individual Debtor(s) ("Amended Schedule J"), and the Second Amended Plan to account for a reduction in their combined average monthly income resulting from Stephanie Turner having been laid off from her full-time position. Amended Schedule I reflects that the Debtors' combined average monthly income is $5,862.58. On Amended Schedule J, they listed average monthly expenses totaling $5,624.75. Among the expenses detailed are payments on account of first and second mortgages on the Vacation Property in the amounts of $295 and $135 per month, respectively. These payments form the basis of the Objection.

Through the Second Amended Plan, the Debtors propose to pay to the Trustee $237 per month for a term of sixty-months.[1] It contemplates that they will continue to make the mortgage payments on both their principal residence and the Vacation Property outside of the plan. Thus, after payment of secured claims totaling $12,263.18, an administrative claim in the amount of $500, and the Trustee's commission of $2,401.20, the unsecured creditors, whose claims total $52,622.10, would receive no dividend.[2]

On April 5, 2010, the Trustee filed the Objection, challenging the reasonableness and necessity of the $430 monthly mortgage payments to maintain the Vacation Property. The Debtors filed the Response on April 12, 2010, arguing that the Second Amended Plan was filed in good faith and that their living expenses are well below the national standard for a family of four. On May 27, 2010, I held a hearing on the Objection and at the conclusion of oral arguments, took the matter under advisement.

### III. POSITIONS OF THE PARTIES

#### The Trustee

Put simply, the Trustee asserts that the Second Amended Plan does not meet the best interest test of 11 U.S.C. § 1325(b)(1)(B) because the Debtors are devoting $430 per month to maintain mortgage payments on the Vacation Property that could otherwise be paid to their unsecured creditors. She contends that these payments are neither reasonable nor necessary expenses,

---

[1] Although the Debtors are below median income debtors, they have indicated that a sixty-month term is necessary to avoid financial hardship.

[2] I note that the Debtors' prior First Amended Chapter 13 Plan, which was filed before Stephanie Turner lost her employment, provided for a 19.94% dividend to their unsecured creditors.

particularly in light of the proposed 0% dividend. Even if only paid over a term of thirty-six months, argues the Trustee, these monthly mortgage payments would total $15,480 that should be devoted to the plan.[3]

The Debtors

Without squarely addressing the issue raised by the Trustee, the Debtors argue that Amended Schedules I and J accurately reflect their "excess income" and inability to pay unsecured creditors. Further, they assert that their food and clothing expenses provided on Schedule J are well below the national standards for a family of four. In any event, the Debtors emphasize that the Vacation Property, which was claimed as exempt, is only a sixteen-by-twenty foot hunting cabin with a half bath, no phone lines, and no electricity. Accordingly, they contend that they have proposed the Second Amended Plan in good faith and ask to continue under it until such time as Stephanie Turner secures full-time employment.

**IV. DISCUSSION**

Section 1325(b)(1)(B) of the Bankruptcy Code provides in relevant part:

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan--

* * *

(B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied

---

[3] To put the net effect of this in perspective, the proposed plan payment would increase to $667 per month, yielding a total plan cost of $24,012 over the applicable commitment period of thirty-six months. After payment of the secured and administrative claims, including the Trustee's commission, $8,847.62 would be available to the general unsecured creditors. Based upon the amount of those claims, the dividend would therefore increase from 0% to 16.8%.

4

to make payments to unsecured creditors under the plan.[4]

This section is also known as the "best efforts test" because it requires Chapter 13 debtors to devote all of their disposable income to the repayment of their unsecured creditors during the term of the plan. The phrase "projected disposable income" was left undefined, but the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005[5] ("BAPCPA") defined "disposable income" as "'current monthly income received by the debtor' less 'amounts reasonably necessary to be expended' for the debtor's maintenance and support, for qualifying charitable contributions, and for business expenditures."[6] Therefore, to calculate "disposable income," and in turn "projected disposable income," one must first determine the "current monthly income received by the debtor" and "amounts reasonably necessary to be expended."

Generally, "current monthly income" is the average monthly income the debtor received during the six months preceding the filing of the debtor's petition.[7] In this way, "[current monthly income] is not current, not really monthly, or necessarily income."[8] Because this historical average is not necessarily reflective of circumstances as they exist at confirmation, the Supreme Court of the United States recently held that "projected disposable income" was a "forward-looking" concept that

---

[4] 11 U.S.C. § 1325(b)(1)(B).

[5] Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, 11 U.S.C. § 101, *et seq*.

[6] *Hamilton v. Lanning*, — S.Ct. —, 2010 WL 2243704 *4 (U.S. June 7, 2010) (*quoting* 11 U.S.C. § 1325(b)(2)(A)(i) and (ii)).

[7] *See* 11 U.S.C. 101(10A)(i).

[8] *In re Kolb*, 366 B.R. 102, 810 n.12 (Bankr. S.D. Ohio 2007) (calculating "projected disposable income" with a mechanical approach, rather than a forward-looking approach recently adopted by the Supreme Court).

allowed "bankruptcy courts [to] account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation."[9]

In the present case, the Debtors determined the income component of their "disposable income" with reference to Amended Schedule I, representing their actual income in light of Stephanie Turner's post-petition loss of employment. Because the Trustee did not object to the income portion of the "disposable income" calculation, I will construe her silence as agreement to the figure reported in Amended Schedule I.

Turning to the expense component of the "disposable income" calculation, for below median income debtors, "amounts reasonably necessary to be expended" includes the full amount needed "for the maintenance or support of the debtor or a dependent of the debtor," as well as certain qualifying charitable contributions, and business expenses.[10] In contrast, BAPCPA requires above median income debtors to determine their expenses with reference to paragraphs (A) and (B) of 11 U.S.C. § 707(b)(2), otherwise known as the means test.[11] Because 11 U.S.C. § 1325(b) expressly limits the expense portion of the means test to above median income debtors and otherwise uses the same phrase to describe permissible maintenance and support that existed prior to BAPCPA, many courts have concluded that BAPCPA did not change the standard as applied to below median income debtors.[12]

---

[9] *Hamilton v. Lanning*, 2010 WL 2243704 *12.

[10] 11 U.S.C. § 1325(b)(2)(A), (B).

[11] 11 U.S.C. § 1325(b)(3); *see also* 11 U.S.C. § 707(b)(2)(A), (B).

[12] *See, e.g., In re Short*, No. 08-11224, 2008 WL 5751873 *3 (Bankr. N.D. Ohio Sept. 11, 2008); *In re Rush*, 387 B.R. 26, 30 (Bankr. W.D. Mo. 2008); *In re Mullen*, 369 B.R. 25, 31 (Bankr. D. Or. 2007); *In re Kolb*, 366 B.R. at 11, *abrogated in part by Hamilton v. Lanning*,

Prior to BAPCPA, "reasonably necessary" expenses were evaluated on a case by case basis. Rather than establishing strict guidelines, courts instead sought to "strike a balance between debtors being required 'to adopt a totally spartan existence' and allowing them to 'continue an extravagant lifestyle at the expense of creditors.'"[13] Generally, courts construed "reasonably necessary" as a standard of adequacy, supporting basic needs, and not related to the lifestyle to which one was accustomed.[14] Accordingly, many courts routinely disallowed expenses for private school tuition,[15] luxury vehicles,[16] recreational boat expenses,[17] country club memberships,[18] and vacation

---

2010 WL 2243704 *4; *In re Miller*, 361 B.R. 224, 228 (Bankr. N.D. Ala. 2007); *In re Girodes*, 350 B.R. 31, 37 (Bankr. M.D.N.C. 2006); *In re Fuller*, 346 B.R. 472, 483 (Bankr. S.D. Ill. 2006); *In re Renicker*, 342 B.R. 304, 308 (Bankr. W.D. Mo. 2006); *see also In re McGillis*, 370 B.R. 720, 729 (Bankr. W.D. Mich. 2007); *In re Charles*, 375 B.R. 338, 340 n.2 (Bankr. E.D. Tex. 2007).

[13] *In re Guild*, 269 B.R. 470, 472 (Bankr. D. Mass. 2001) (*quoting In re Beckel*, 268 B.R. 179, 183 (Bankr. N.D. Iowa 2001)).

[14] *In re McNichols*, 249 B.R. 160, 169 (Bankr. N.D. Ill. 2000); *In re Cardillo*, 170 B.R. 490, 491 (Bankr. D.N.H. 1994) (*citing In re Sutliff*, 79 B.R. 151, 157 (Bankr. N.D.N.Y. 1987)).

[15] *Watson v. Boyajian (In re Watson)*, 403 F.3d 1, 8 (1st Cir. 2005); *Lynch v. Tate (In re Lynch)*, 299 B.R. 776 (W.D.N.C. 2003); *In re Ehret*, 238 B.R. 85 (Bankr. D.N.J. 1999); *In re Zaleski,* 216 B.R. 425 (Bankr. D.N.D. 1997).

[16] *In re Zaleski,* 216 B.R. at 432 (Chevy Blazer); *In re Gibson*, 142 B.R. 879 (Bankr. E.D. Mo. 1992) (Cadillac and Corvette); *In re Reyes*, 106 B.R. 155 (Bankr. N.D. Ill. 1989) (Chevy Blazer); *In re Rogers*, 65 B.R. 1018 (Bankr. E.D. Mich. 1986) (Corvette). *See also In re Lindsey*, 243 B.R. 30 (Bankr. E.D. Tenn. 1999) (tractor and baler); *In re Brooks*, 241 B.R. 184 (Bankr. S.D. Ohio 1999) (recreational vehicle); *In re Rybicki*, 138 B.R. 225 (Bankr. S.D. Ill. 1992) (camper).

[17] *In re Kasun*, 186 B.R. 62 (Bankr. E.D. Va. 1995) (boat, boat slip rental, and boat insurance); *In re Hedges*, 68 B.R. 18, 20 (Bankr. E.D. Va. 1986) (Chaparral boat).

[18] *In re Chrzanowski*, 70 B.R. 447 (Bankr. D. Del. 1987); *In re Kitson*, 65 B.R. 615, 622, (Bankr. E.D.N.C. 1986).

7

homes[19] on the basis that luxury expenses detract from possible payments to unsecured creditors. In *In re Dick*, for example, I previously held that "maintaining a non-income producing vacation home goes far beyond maintaining the debtor's basic needs."[20]

It is the debtor's burden to prove that an expense is reasonably necessary.[21] In the present case, the Debtors have not carried that burden. Particularly in light of my prior decision in *In re Dick*, they have offered no explanation why the monthly mortgage payments for the Vacation Property are "reasonably necessary." It is irrelevant that some of the Debtors' living expenses are substantially below the amount permissible under the "national standards" because Congress deliberately excluded below median income debtors from determining their expenses with respect to 11 U.S.C. § 707(b)(2). Below median income debtors are simply subject to a different standard. Moreover, individual expenses must be scrutinized and the Vacation Property is no less a luxury merely because it is not opulent. Nor is it significant that it is exempt because the funds used to pay the mortgages are not. Consequently, even had Stephanie Turner not lost her employment, or alternatively, if she had obtained new employment, this expense would remain objectionable unless the Debtors could otherwise propose a plan that paid unsecured creditors a 100% dividend.

---

[19] *In re McKown*, 227 B.R. 287 (Bankr. N.D. Ohio 1998); *In re Dick*, 222 B.R. 189 (Bankr. D. Mass. 1998); *In re Cardillo*, 170 B.R. at 491.

[20] *In re Dick*, 222 B.R. at 191.

[21] *In re Watson*, 403 F.3d at 8; *see In re Phillips*, 382 B.R. 153, 171 (Bankr. D. Mass. 2008).

**V. CONCLUSION**

      In light of the foregoing, I will enter an order sustaining the Objection.

*[signature]*

_____
William C. Hillman
United States Bankruptcy Judge

Dated: June 17, 2010